UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SHARI C. ROBERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11-CV-2232 (CEJ) |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On September 23, 2009, plaintiff Shari Roberson filed an application for a period of disability and for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of September 14, 2009.  (Tr. 84-90).  After plaintiff's application was denied on initial consideration (Tr. 39-43), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 44-45).

Plaintiff and counsel appeared for a hearing on August 31, 2010.  (Tr. 19-32).  The ALJ issued a decision denying plaintiff's application on October 18, 2010.  (Tr. 9-18).  The Appeals Council denied plaintiff's request for review on November 22, 2011.  (Tr. 5-8).  On December 22, 2011, the council set aside the denial in order to consider additional information and again denied the request for review.  (Tr. 1-4).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In her Disability Report (Tr. 125-33), plaintiff listed her disabling condition as a bad back.  She stated that her work required to stand, bend, and twist.  She had acute back spasms and was "in pain all day long."  She could not drive a car and was unable to sleep.  The medication she took made it hard for her to work.  She had already undergone three surgical procedures and anticipated a fourth one.  Plaintiff's condition first interfered with her ability to work in 2007; she became unable to work on September 14, 2009.  She worked as a dental assistant between 2000 and 2009, (Tr. 127), and as a fitness trainer between 1983 and 2003.  At the time she completed the report, she was taking Alprazolam for anxiety, Chantix for smoking cessation, Lisinopril for blood pressure, Flexeril for relief of muscle spasm, and Vicodin for pain. Hydrocodone appeared on an updated medications list.  (Tr. 161).

Plaintiff completed a Function Report on October 27, 2009.[1]  (Tr. 137-45).  In response to a question regarding her average daily activities, plaintiff wrote that she woke up around 6:00 in the morning and took pain medication.  She then slept until 9:00 a.m., when she took a muscle relaxer and her blood pressure medication.  She sat in a chair or lay in a hospital bed and watched television, did crossword puzzles, knitted or talked on the phone.  Her family members scheduled their visits so that she was not alone at any time; they also cooked and cleaned for her.  With respect to self-care, plaintiff stated that because she was unable to bend, she could not put on her shoes or pants, shave her legs, or wash her hair.  She got her own cereal in the morning; if the milk container was full, someone else poured it for her.  She made herself a cheese sandwich for lunch.  She stated that she used to love to cook but was

---

[1]Plaintiff underwent lumbar fusion on September 24, 2009, and was still recovering from surgery at the time she completed the Function Report.

unable to do so any longer.  She did not do any household chores or shopping because she could not bend or stoop.  She used a walker.  When the weather was good, she and her husband walked outside; otherwise she tried to walk in the house.  She was afraid to go out alone because her right leg occasionally collapsed.  With respect to traveling in an automobile, she stated that her doctor had not yet released her to drive or travel in a car.  She also stated that she was afraid that she would be paralyzed if she were in a car accident.  Plaintiff stated that her medication interfered with her ability to pay bills and handle a savings or checking account.  She had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, and completing tasks.  She could walk for 5 to 10 minutes before she needed to rest for about 5 minutes.  Her pain interfered with her ability to sleep.

In a narrative section, plaintiff stated that she sustained a work-related injury in 1998 while working as a fitness instructor.  (Tr. 144).  She had surgery at that time. Eventually, she got jobs as an aerobics instructor and a dental assistant.  She gave up the work as a fitness instructor in 2007 because her leg and back always hurt.  She had surgery again and, after a four-month leave, returned to half-time work at the dental office.  She then started treatment for pain management, apparently without success.

In an updated Disability Report (Tr. 151-57), plaintiff stated that her "leg hurts 100%" and that she was unable to sit or stand without pain.

### B.  Hearing on August 31, 2010

Plaintiff testified at the hearing that she had a twelfth-grade education.  She was trained as a dental assistant and held certificates from two exercise and fitness

associations. (Tr. 21). She had surgical procedures for her back in 1990,[2] 1999, 2007, and 2009. She said that her surgeon had not wanted her to return to work after surgery in 2007 but she felt compelled to return on a part-time basis to help support her family. (Tr. 24). In April 2010, her surgeon told her that she could have another surgical procedure, but she did not believe she could endure it. Her other option was to have a nerve stimulator implanted in her back; she was scheduled to discuss this with a physician. At the time of the hearing, plaintiff was taking the medications Hydrocodone and Flexeril, which she stated affected her memory. It was observed that plaintiff was using a cane -- she testified that she used it when climbing stairs because her right leg was very weak. In response to the ALJ's question about why she climbed stairs, plaintiff stated that she went downstairs to do laundry – her husband placed the laundry basket in front of the washer and she used a grabber to transfer small items into the washer and dryer. She stayed in the basement and watched television until the laundry was completed because she could manage only one trip up and down the stairs each day. (Tr. 26).

Plaintiff testified that the family had a computer but she that she did not use it for anything other than playing solitaire. (Tr. 27). She drove twice a week -- once to the library to check out movies and again to buy lottery tickets. She no longer attended church because she could not sit still long enough. Friends and family visited frequently to use the in-ground swimming pool. She stated that she got in the pool and "move[d] around a little" but did not swim. She did word puzzles and crocheted.

---

[2]This is incorrect: the record reflects that plaintiff first had surgery in 1999, not 1990. See Tr. 292-93.

Plaintiff testified that she was able to shower and dress on her own, but required help to put on socks and shoes.  (Tr. 29).  She took Flexeril and pain medication before going to bed and usually slept about four and a half hours before the pain woke her up. She testified that she could stand for 10 minutes, sit for 30 minutes, and walk for 10 minutes.  She stated that she could not lift a gallon of milk.

## C.  Medical Evidence

Plaintiff alleges disability arising from chronic low back pain.  William F. Hoffman, M.D., has treated her for this condition since 1999.  Plaintiff first underwent surgery in April 1999, when Dr. Hoffman performed a lumbar laminectomy for a herniated lumbar disc.  She had a recurrence of symptoms and in December 1999, Dr. Hoffman performed a laminotomy and fusion at L4-L5.  See Tr. 292 (Hoffman letter dated December 2, 2009).

Plaintiff had an MRI on January 24, 2007, to investigate complaints of pain in her lower back, right hip, and right leg.  (Tr. 167).  The MRI indicated the presence of significant stenosis at L4-L5 due to a combination of bulging disc and facet disease and possible synovial cyst.  On May 8, 2007, Dr. Hoffman performed a third surgical procedure, a "generous bilateral laminotomy" at L4-L5.  (Tr. 244-48).  A pre-operative examination disclosed marked restriction in range of motion of the spine, secondary to pain.  Straight leg raising[3] produced back pain bilaterally.  Her reflexes were symmetrical.  Her primary symptoms were severe low back pain, associated with right leg pain all the way to her foot.  Standing was her worst position.  However, she did not feel that her legs were weak and she had no bowel or bladder incontinence.

---

[3]When straight-leg raising induces muscle spasms it suggests intervertebral disk disease.  The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006).

Despite the surgery, an MRI completed on November 13, 2007, disclosed slight worsening of disc disease predominantly involving stenosis of the lateral recesses and foramen without worsening central stenosis. (Tr. 166).

On April 1, 2008, Ellis R. Taylor, M.D., completed a consultation examination. (Tr. 173-76). Plaintiff reported that she had done very well for several months after the 2007 surgery, including when she returned to part-time work as a dental assistant. She had a recurrence of pain when she returned to full-time work. She described the pain as radiating from her low back, down the right thigh, to the top of her right foot. The pain was brought on by standing, driving, and lying down in most positions. She found relief only in lying down with pillows under her legs. Ibuprofen did not appear to provide relief; Flexeril helped her to sleep; hydrocodone provided some pain relief but was not as effective as it had been. She sometimes felt that her right leg was going to give out, although she had no specific motor weakness. On examination, plaintiff's station and gait were normal, as were heel- and toe-walking. She could squat and rise without difficulty and hop on either foot without evidence of motor weakness. She had some tenderness on palpation but no active trigger points. She had radicular pain when bending forward 80 degrees. She also had pain on extension and flexion to the right, but not to the left. Strength testing and sensory testing were normal. Straight leg raising was negative, while a Patrick's Test[4] administered on the left side caused radicular pain on the right side. Dr. Taylor could not say whether

_____

[4]Patrick's, or Faber's, Test is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine and sacroiliac region. http://www.physio-pedia.com/FABER_Test, (last visited on Oct. 5, 2012).

plaintiff's pain was neuropathic.  He opined that spinal cord stimulation (SCS)[5] might be appropriate.  He administered a transforaminal epidural steroid injection (ESI).[6]

Dr. Hoffman's records include a notation regarding plaintiff's treatment by Gregory Stynowick, M.D., a pain management specialist, on July 15, 2008.  (Tr. 266). Dr. Stynowick reported that plaintiff had right L5 radiculopathy, lumbar post-laminectomy syndrome (also known as failed back syndrome), paraspinous muscle spasm, and facet arthropathy.  Plaintiff was started on Lortab, Neurontin, and Flexeril. Dr. Stynowick recommended another steroid injection to target the right L5 root.  See also Tr. 294 (Stynowick record).

Plaintiff was treated for hypertension by Samantha Sattler, M.D.  On September 2, 2008, plaintiff complained of dizziness which coincided with starting Neurontin.  (Tr. 212).   Dr. Sattler described plaintiff as "alert, well appearing, and in no distress." Plaintiff was directed to monitor her blood pressure at home.  Dr. Sattler gave plaintiff a prescription for Vicodin.  On November 26, 2008, plaintiff complained of elbow pain after a fall.  Dr. Sattler noted that plaintiff smelled of alcohol.  X-rays of the elbow were negative and Dr. Sattler prescribed Nabumetone and directed plaintiff to apply ice to her elbow.  (Tr. 210-11, 237).  Plaintiff continued to complain of elbow pain on December 16, 2008, and requested Vicodin.  (Tr. 209-10).  Dr. Sattler gave plaintiff

---

[5]Spinal cord stimulation involves the implantation of a small pulse generator that sends electrical pulses to the spinal cord.  The procedure is used to treat severe, chronic pain. WebMD http://www.webmd.com/back-pain/spinal-cord-stimulation-for-low-back-pain, (last visited Oct. 4, 2012).

[6]ESI combines a corticosteroid with a local anesthetic.  ESI can be used to treat pain and inflammation from pressure on the spinal cord.  ESI is usually not tried unless symptoms have not responded to other nonsurgical treatment.    WebMD http://www.webmd.com/back-pain/epidural-steroid-injections-for-lumbar-spinal-stenosis (last visited on Oct. 4, 2012).

a prescription for Vicodin, and discontinued Darvocet, Nabumetone, and Neurontin. On January 8, 2009, Dr. Sattler noted that plaintiff's liver function tests were abnormal. (Tr. 208). On March 13, 2009, plaintiff complained of stress. (Tr. 206-07). She had been participating in pain management treatment and receiving epidural shots.   Dr. Sattler noted alcohol on plaintiff's breath and diagnosed plaintiff with generalized anxiety disorder, chronic low back pain, alcohol abuse, and hypertension. On June 16, 2009, plaintiff reported that she had been rear-ended in a car accident. (Tr. 205).  She stated that she was in severe pain, which she rated at level 9 on a 10-point scale. The pain was non-radiating, and plaintiff had no weakness, numbness or tingling.   X-rays of the lumbar spine disclosed mild endplate sclerosis and facet arthropathy, mild loss of intervertebral disc height at L4/L5 with slight anterolisthesis. (Tr. 186).  Dr. Sattler provided a temporary prescription for Vicodin until plaintiff could be seen by her pain management specialist.  (Tr. 205).

Plaintiff had an MRI of the lumbar spine on July 17, 2009.  (Tr. 195-97).  This disclosed a very prominent disc protrusion of the L4-L5 disc.  There was prominent fat attenuation and narrowing of the foramina.   Central canal stenosis of a moderately severe degree was noted with lateral recess stenosis as well.   Compromised foramina were further narrowed by facet joint arthropathy.  There were milder disc bulges in the upper lumbar spine.  Scar tissue was noted at L4-L5.  On July 20, 2009, plaintiff told Dr. Hoffman that she did "fairly well" if she did not work.  Dr. Hoffman opined that plaintiff should be considered disabled.  (Tr. 266).  On August 12, 2009, Dr. Hoffman noted that recent x-rays showed a progressive L4-L5 slip.   (Tr. 265).  He and plaintiff discussed a surgical fusion.  On September 9, 2009, Dr. Hoffman excused plaintiff from work from September 14, 2009 through 12 weeks after surgery on September 24,

2009.  (Tr. 272).   On September 24, 2009, Dr. Hoffman performed a decompressive bilateral laminectomy at L4-L5 and a lumbar fusion, using a pedicle screw and rod compression construct.  (Tr. 268).  Plaintiff's post-operative diagnoses were: unstable postoperative L4-L5 grade 1 spondylolisthesis[7] and multi-level spinal stenosis at L4-L5 and L5-S1.

A nonexamining consultant[8] completed a Physical Residual Functioning Capacity Assessment (PRFCA) on November 4, 2009.  (Tr. 281-86).  Based on a review of the medical records, the consultant determined that plaintiff can occasionally lift or carry 20 pounds and frequently carry 10 pounds.  She can sit, stand, or walk about 6 hours in an 8 hour day, and had no limitations in pushing or pulling.  The examiner noted that plaintiff's condition was severely limited at that moment, but attributed this to her recent surgery.  She was showing satisfactory post-surgical healing.   Because her surgeon had noted that plaintiff would be off work for approximately 12 weeks, a period that did not meet the durational requirements, the consultant completed a "projected RFC".  (Tr. 284).

On December 2, 2009, Dr. Hoffman wrote a letter in which he set out plaintiff's treatment history, including the four surgical procedures.  (Tr. 292-93).  He noted that plaintiff's work required her to stand, turn, and use her back muscles in a way that

---

[7]Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it.  http://www.ncbi.nlm.nih.gov/pubmed health/PMH0002240/ (last visited on Oct. 5, 2012).

[8]The form indicates that the PRFCA was completed by a Single Decision Maker (SDM).   Missouri is one of ten test states participating in a prototype test of the SDM model, in which "Disability Examiners with SDM authority complete all disability determination forms and make initial disability determinations in many cases without medical or psychological consultant (MC or PC) signoff." https://secure.ssa.gov/poms. nsf/lnx/0412015100 (last visited on July 18, 2012).

caused her pain.  He continued, "The patient has continued to have levels of pain which in my opinion preclude her participating in any gainful employment.  She has had four major back surgeries with two of them fusions."

Plaintiff requested Vicodin from Dr. Hoffman on October 15, December 7,  and December 18, 2009.  (Tr. 298).  On December 18, 2009, he spoke to her about her utilization.  She said that someone had been "taking" her pills from her and that she now kept them in a lock box.  He warned her that he would not refill her prescriptions at her current rate.  Nonetheless, she received prescriptions on January 7 and January 21, 2010.  Id.  On January 21, 2010, she told Dr. Hoffman that she was trying to get her usage down to 4 pills per day; he told her that she was going to have to learn to tolerate a certain amount of pain.  He warned her that she risked developing a tolerance for or dependence on the Vicodin.  (Tr. 297).

The record contains a letter written by Dr. Stynowick  on January 25, 2010.  (Tr. 294).  He stated that he had provided pain management treatment to plaintiff from July 15, 2008 through June 24, 2009 for severe low back pain and lower extremity pain secondary to a right L-5 radiculopathy and lumbar post-laminectomy syndrome.  Back surgeries and pain management injections had not provided sustained relief and he did not believe that she could participate in gainful employment.

On February 18, 2010, plaintiff received a Vicodin refill.  (Tr. 297).  On February 24, 2010, plaintiff called Dr. Hoffman and said that she was incapacitated by pain in her buttocks and legs that was restricting her ability to move and walk.  He ordered an MRI to evaluate possible abnormalities.  Id.  The MRI completed on March 9, 2010 showed no overt central canal stenosis.  There was neural foraminal narrowing due to facet hypertrophic changes.  (Tr. 299).  At an office visit on March 10, 2010, plaintiff

-10-

reported that she had been doing more household work, including laundry, and that this coincided with the increase in her pain level. When her husband took over the domestic chores, her pain decreased again. Dr. Hoffman and plaintiff discussed whether a spinal cord stimulator would prove helpful. Plaintiff received refills of Vicodin on March 9 and April 1, 2010. (Tr. 297).

Plaintiff spoke with Dr. Hoffman by telephone on April 7, 2010. She reported that "she has been better with surgery but normal activities like sitting do increase her pain." He told her he did not think he had anything more to offer her in terms of relief. He opined that her residual symptoms were due to scarring, nerve manipulation, and post-operative changes. (Tr. 296). Plaintiff received Vicodin refills on April 21, May 24, June 8, and July 2, 2010.

Plaintiff saw Dr. Stynowick on September 1, 2010. (Tr. 312). She complained of bilateral low back pain and right leg pain. She felt that Vicodin was not controlling the pain. Straight-leg raising was positive on the right side. Range of motion and gait were within normal limits. He assessed her with L5 radiculopathy, lumbar paraspinous muscle spasm, myofascial pain and painful hardware, and lumbar post-laminectomy syndrome. He discussed steroid injections and a spinal cord stimulator with plaintiff. He changed her Vicodin prescription to Norco. She returned on September 23, 2010 for a steroid injection. (Tr. 310). He discontinued the Norco because she reported it was ineffective; he prescribed Percocet.

An MRI on October 7, 2010, disclosed the prior L4-L5 fixation with scattered degenerative changes, most significantly involving the neural foramen at L4-L5 and L5-S1, and encroaching the nerves in the neural foramen. The exam was not significantly changed from the March 10, 2010 examination. (Tr. 306-07).

-11-

On October 21, 2010, plaintiff reported to Dr. Stynowick that she had not received significant relief from the recent injection. (Tr. 306). Percocet provided her moderate pain relief.  On examination, she had positive straight leg raising without weakness.  She limped on the right side.  He refilled her Percocet prescription and suggested another injection.  She was to consider spinal cord stimulation after the first of the year.

Plaintiff had another injection on January 27, 2011. (Tr. 315).  On February 24, 2011, she reported that her pain medication provided moderate relief. (Tr. 314).  The injection provided about 50% to 60% pain relief.  The pain was returning but was not as bad.  Plaintiff stated that she would like to do a trial of spinal cord stimulation but that she could not afford it.  The clinical assessment was lumbar post-laminectomy syndrome, lumbar radiculitis, and lumbar spondylosis.  On April 28, 2011, plaintiff reported that she could not afford another injection or spinal cord stimulation.  (Tr. 320).  On August 17, 2011, she reported that Percocet provided moderate pain control. (Tr. 319).  On October 26, 2011, in a letter addressed to plaintiff's counsel, Dr. Stynowick stated that plaintiff continued to have persistent back and leg pain that made it impossible for her to sit, stand or bend for long periods of time.  (Tr. 327). Plaintiff was compliant with pain medication, urine drug screens, and injection therapy. Her levels of pain precluded her from participating in any gainful employment, particularly as a dental assistant.

### III.  The ALJ's Decision

In the decision issued on October 18, 2010, the ALJ made the following findings:

1.      Plaintiff meets the insured status requirements through December 31, 2014.

2.      Plaintiff has not engaged in substantial gainful activity since September 14, 2009, the alleged onset date.

3.      Plaintiff has the following severe impairments: lumbar spine degenerative joint disease and degenerative disc disease.

4.      Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      Plaintiff has the residual functional capacity to perform the full range of sedentary work, as defined in 20 C.F.R. § 404.1567(a).

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was a younger individual on the alleged date of onset.

8.      Plaintiff has at least a high school education and can communicate in English.

9.      Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled" whether or not plaintiff has transferable job skills.

10.     Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from September 14, 2009, through the date of the decision.

(Tr. 14-18).

## IV.  Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240

F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.   Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

In this instance, plaintiff presented new evidence to the Appeals Council.  The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision.  20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record.  Id.  This Court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination.  Id.

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and

(3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.

If the claimant does not suffer from a listed impairment or its equivalent, the

Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most

a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an

individual's medically determinable impairment(s), including any related symptoms,

such as pain, may cause physical or mental limitations or restrictions that may affect

his or her capacity to do work-related physical and mental activities."  Social Security

Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all

relevant evidence, including the medical records, observations by treating physicians

and others, and an individual's own description of his limitations."  Moore, 572 F.3d at

523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.

Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d

1211, 1217 (8th Cir. 2002).  This evaluation requires that the ALJ consider "(1) the

claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3)

the precipitating and aggravating factors; (4) the dosage, effectiveness, and side

effects of medication; (5) any functional restrictions; (6) the claimant's work history;

and (7) the absence of objective medical evidence to support the claimant's

complaints."  Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and

citation omitted).  "Although 'an ALJ may not discount a claimant's allegations of

disabling pain solely because the objective medical evidence does not fully support

them,' the ALJ may find that these allegations are not credible 'if there are

inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erroneously discounted the opinions of her treating physicians and incorrectly determined that her allegations of disabling pain were not credible.  She contends that the ALJ's determination that she retains the RFC to perform sedentary work is not supported by substantial evidence in the record.  Finally,

she asserts that the ALJ erred at Step 5 in relying on the Medical-Vocational Guidelines.

## A.  <u>Treating Physicians' Opinions</u>

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record.  20 C.F.R. § 404.1527(b).  The opinion of a treating source may be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole.  20 C.F.R. § 404.1527(c)(2).  However, the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment."  <u>Qualls v. Apfel</u>, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted).

Here, plaintiff's back surgeon and pain management specialist both opined that plaintiff's condition precluded work.  The ALJ properly declined to adopt their opinion with respect to her capacity to work, an issue which is reserved to the Commissioner.  As is discussed below, however, the Court finds that the ALJ failed to give the proper weight to the physicians' observations with respect to plaintiff's pain.

## B.  <u>Plaintiff's Allegations of Pain</u>

An ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them.  <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 816 (8th Cir. 2003) (citations omitted).  In addition to the objective medical evidence, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of the pain; dosage, effectiveness and side effects of medications; precipitating and aggravating factors; and functional restrictions."  <u>Id.</u>

The ALJ found that plaintiff's allegations of pain were not fully supported by the clinical and objective findings.  In particular, the ALJ stated that, after the fourth surgical procedure in September 2009, the record failed to show evidence of a significant degree of atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion.  However, none of plaintiff's physicians suggested that the absence of these signs was a basis for doubting plaintiff's complaints of pain.  For example, on April 1, 2008, Dr. Taylor noted that plaintiff had a normal gait, the ability to hop from foot to foot and rise without difficulty, and normal reflexes and strength.  Nonetheless, he administered a steroid injection, suggesting that plaintiff's pain was a medical condition warranting treatment, despite the absence of gait disturbance and sensory or motor loss.  Thus, the correlation the ALJ made between these objective signs and plaintiff's credibility is not supported by substantial evidence.  Moreover, to the extent that the ALJ determined that plaintiff's September 2009 surgery substantially alleviated her pain, by April 2010, plaintiff was seeking treatment  for "residual symptoms" and complained of increased pain with "normal activities like sitting."

The ALJ noted that the MRI completed on March 9, 2010, showed normal vertebral alignment and no "overt central canal stenosis."  (Tr. 299-300).  However, similar MRI findings in October 2010 were interpreted as showing neural foraminal narrowing due to facet hypertrophic changes and degenerative changes encroaching the nerves in the neural foramen.  (Tr. 307-08).  These MRI reports do not detract from plaintiff's allegations of pain.

The ALJ stated that plaintiff had not been "prescribed pain modalities such as a back brace or an assistive device for ambulation."  (Tr. 16).  The record establishes,

-18-

however, that plaintiff was prescribed other pain modalities, including a referral to pain management services; prescriptions for the narcotics Vicodin, Percocet, and Norco; and multiple steroidal injections, both before and after the September 2009 surgery. She expressed an interest in spinal cord stimulation, but stated that she was unable to afford the procedure. More generally, the record supports a conclusion that plaintiff was persistent in her pursuit of effective treatment but that her pain was unresponsive to repeated intervention. The diagnosis of chronic pain in combination with pain management services and drug therapy can be an "objective medical fact" supporting an allegation of disabling pain. O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (quoting Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998)).

The Commissioner notes that plaintiff stopped seeing her back surgeon in March 2010 and argues that this is evidence that her condition improved. The Court disagrees with this characterization of the record. In April 2010, Dr. Hoffman told plaintiff that he believed her "residual symptoms," -- such as increased pain with normal activities like sitting -- were related to "scarring, nerve manipulation, and post-operative changes. He also stated that he could not offer her any further help. (Tr. 296). Thereafter, plaintiff's primary treatment for her condition consisted of pain management services. The fact that plaintiff's surgeon could no longer offer beneficial treatment does not equate with a finding of medical improvement sufficient to engage in sustained work-related activities.

The ALJ noted that plaintiff's earnings before her alleged onset date "were somewhat inconsistent." Between 1993 and 1998, plaintiff worked as a fitness instructor; her annual earnings increased every year from approximately $5,000 to approximately $20,000. (Tr. 127, 97). In 1999, she underwent two surgical

procedures after suffering a work-related injury; her earnings were very low in 2000. She started work as a dental assistant in late 2000 (Tr. 127) and, in 2001, she earned in excess of $22,000 from two employers.  (Tr. 105).  She continued to earn at about the same level until 2005, when she earned only $7,500, but her wages increased again thereafter.  She worked until September 2009 despite increasing pain.  The Court does not agree with defendant that plaintiff's work history demonstrates a lack of motivation to work.

The ALJ determined that plaintiff's daily activities were inconsistent with her allegations of disabling pain.  Her activities consisted of watching television, crocheting, doing pencil-and-paper puzzles, playing solitaire on the computer, and talking with visitors.  She prepared simple foods for her breakfast and lunch.  Utilizing a cane, she went downstairs to launder small items that she could transfer to the washer and dryer with the help of a long-handled grabber.  She remained downstairs until the laundry was completed because she could not manage the stairs more than once per day.  She drove the car twice per week.  The Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000)).

The Court concludes that the ALJ's credibility analysis rested on inaccurate or incomplete statements of the evidence in the record.  Accordingly, remand is required for reconsideration of plaintiff's claims of disabling pain.

### C.  The RFC Determination

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

The ALJ's error in assessing plaintiff's subjective complaints of pain, alone, would invalidate the RFC determination. Additionally, however, the record does not contain medical evidence from which a proper determination of plaintiff's limitations can be made. As stated above, the ALJ properly discounted Dr. Hoffman's and Dr. Stynowick's opinions with respect to the "ultimate issue" of plaintiff's capacity to work. However, there is no indication that a physician completed a formal assessment of plaintiff's functional capacities. And, while the record contains a Physical Residual Functioning Capacity Assessment (PRFCA), reliance on the opinion of nonmedical state evaluator will not, without more, provide substantial evidence in support of an RFC. See, e.g., Dewey v. Astrue, 509 F.3d 447, 449–50 (8th Cir. 2007). On remand, it will be necessary to obtain a formal assessment of plaintiff's functional capacities.

### D.  Use of Medical-Vocational Guidelines

The ALJ did not obtain the testimony of a vocational expert to determine whether plaintiff could make an adjustment to other work. "[W]here the claimant

suffers from a nonexertional impairment such as pain, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical-Vocational Guidelines." Baker v. Barnhart, 457 F.3d 882, 894 (8th Cir. 2006) (quoting Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005)).  An ALJ may properly rely on the guidelines "[w]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ." Id. at  94-95 (alteration in original, citation and quotation omitted).  If, on remand, the ALJ determines that plaintiff's allegations of disabling pain are credible, it will be necessary to obtain the testimony of a vocational expert at Step 5 of the analysis.

### VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of December, 2012.

-22-